UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 22-cr-205 (MJD/TNL) |
| Plaintiff, | |
| v. | **REPORT & RECOMMENDATION** |
| Maurice Lamar Myles, | |
| Defendant. | |

Robert M. Lewis, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for the Government); and

Manny K. Atwal and Matthew Deates, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415 (for Defendant).

## I. INTRODUCTION

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant Maurice Lamar Myles' Motion to Suppress Evidence Obtained as a Result of Search and Seizure, ECF No. 23. This motion has been referred to the undersigned for a report and recommendation to the district court, the Honorable Michael J. Davis, District Judge of the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. Local Rule 72.1.

A hearing on the motion was held December 13, 2022. ECF No.  Assistant United States Attorney Robert M. Lewis appeared on behalf of the United States of America (the "Government"). Attorneys Manny K. Atwal and Matthew Deates appeared on behalf of

Defendant. Post-hearing briefing is now complete, and these motions are ripe for a determination by the Court.

## II. FINDINGS

At the December 13 hearing, the Court heard testimony from Minnesota Department of Corrections ("DOC") Investigator Troy Lennander. The Government offered and the Court received: Government Exhibit 1, Defendant's DOC Conditions of Release; Government Exhibit 2, body worn camera footage from four DOC investigators; and Government Exhibit 3, a still photo of Defendant from the body worn camera footage.

Based upon the file and documents contained therein, along with the testimony and exhibits presented, the undersigned Magistrate Judge makes the following findings.

### A. Background

Investigator Lennander is a licensed peace officer and has been employed with the DOC for over six years. Tr. 7:22-8:2, 9:13-14, ECF No. 39.[1] As an officer with the DOC's fugitive apprehension team, Investigator Lennander's primary duties include locating and arresting offenders with felony warrants for alleged violations of supervised release. Tr. 8:14-22, 9:9-12, 28:21-25. He frequently conducts searches of offenders at their homes and assists other agents in conducting warrantless searches. Tr. 28:18-25. He does not supervise individuals who are on supervised release in the community. Tr. 28:14-17.

### B. Investigation and Surveillance of Dai'quan Husten

For several months leading up to April 2022, Investigator Lennander conducted an

---

[1] The transcript has been temporarily sealed to allow for the process of redacting any personal identifiers. *See generally* D. Minn. LR 5.5. The Court refers to the redacted transcript in this Report and Recommendation. *See* ECF No. 39. The release of transcript restriction is set for March 27, 2023. *Id.*

investigation into the whereabouts of Dai'quan Husten. Tr. 11:22-12:1, 29:17-21. Husten had an active DOC warrant, issued 13 months earlier, due to an alleged violation of his supervised release. Tr. 11:11-21, 12:2-4, 14:11-13, 29:1-10, 32:6-10. Investigator Lennander spent approximately 40 hours trying to locate Husten. Tr. 29:22-30:4, 51:14-20. Through his investigation, he learned that Husten was on supervised release for a weapons offense, was a known gang member, and had a brother named Maurice Myles ("Defendant"). Tr. 12:8-18.

Investigator Lennander did not investigate Defendant specifically, but learned that he spent time with Husten, was a known gang member, and was on supervised release for a felony weapons-related offense. Tr. 12:19-25, 30:5-7, 51:7-10, 51:21-52:5. Defendant did not have an active warrant, and Investigator Lennander never called Defendant's supervising agent to discuss his conditions of supervised release. Tr. 32:11-12, 52:6-13. Investigator Lennander testified, however, that there are standard terms of supervised release for individuals convicted of violent offenses or with gang activity in their past. Tr. 46:19-25. Those conditions typically include restrictions on associations with other gang members, though there can be exceptions for contact with family members or other exceptions approved by the supervising agent. Tr. 31:2-21, 47:1-3.

On April 29, 2022, Investigator Lennander, his partner Investigator Ryan Pankratz, and a few other investigators went to an apartment building in Oakdale because they had intelligence that Husten was at the building. Tr. 10:12-11:10. Investigator Lennander testified that he and the other investigators were there for the sole purpose of arresting Husten. Tr. 32:13-24.

At some point that day, the investigators stopped surveilling the apartment building and went to take a break about four or five blocks away. Tr. 13:9-16. While on break, they observed Husten walk by with an individual that Investigator Lennander recognized as Defendant. Tr. 13:17-22, 32:25-33:20, 36:16-18, 45:25-46:8. Husten and Defendant were heading west and appeared to be heading towards a nearby store. Tr. 13:23-14:1. The investigators did not observe any weapons or contraband on Husten or Defendant. Tr. 33:21-24, 39:18-21, 46:9-13.

According to Investigator Lennander, his team formulated a plan for some of the investigators to follow Husten and Defendant to the store and others to go back to the apartment building, continue surveillance, and stop Husten and Defendant when they got there. Tr. 14:2-17, 36:21-23. They planned to arrest Husten on his DOC warrant. Tr. 14:18-20, 47:9-11. They also planned to detain Defendant because they believed he was violating the conditions of his supervised release by being with Husten, a known gang member. Tr. 16:16-21. According to Investigator Lennander, after detaining Defendant, investigators would then contact his supervised release agent to see if the agent wanted to violate Defendant or not. Tr. 14:21-15:3, 34:8-11, 47:9-23. For officer safety reasons, they also planned to handcuff and frisk Defendant for weapons given that he would be in the immediate area while officers executed an arrest warrant on Husten. Tr. 26:9-25, 48:10-16.

Most of the team, including Investigator Lennander, returned to the apartment building in their unmarked vehicles and waited outside the building. Tr. 36:24-38:4. The investigators were in plain clothes, wearing items such as tennis shoes, jeans, cargo shorts,

4

and a baseball cap. Tr. 38:6-24. A few blocks away, Investigator Pankratz followed Husten and Defendant to a nearby convenience store. Tr. 14:4-5, 36:16-20. He kept an eye on them as they entered the store, exited the store, and headed back to the apartment building. Tr. 45:4-24.

### C. Investigators' Encounter with Husten and Defendant

Investigators observed Husten and Defendant walking towards the apartment building. Tr. 17:6-12, 39:7-12. When they approached the southwest corner door of the apartment building, Investigator Lennander's team approached. Tr. 17:13-15, 39:13-17. The investigators jumped out of their unmarked vehicles, walked quickly towards Husten and Defendant, pointed their firearms at them, and started yelling commands. Tr. 39:25-8; *accord* Ex. 2, Lennander's Body Worn Camera, at 00:19-00:38. The investigators ordered Husten and Defendant down to the ground at gunpoint. Tr. 17:16-18.

According to Investigator Lennander, Husten cooperated with commands and got down on the ground, but Defendant instead walked towards the apartment door. Tr. 17:19-18:1. Defendant got close to the apartment door, but Investigator Pankratz called Defendant back and told him not to walk towards the door. Tr. 18:2-7. Defendant complied and turned around. Tr. 18:8-10. Investigator Pankratz then approached Defendant, grabbed Defendant's arms, and started putting them behind his back. Tr. 41:20-42:12. Defendant complied and did not resist. Tr. 41:13-23; *accord* Ex. 2, Lennander Body Worn Camera, at 00:32-01:03.

As Investigator Pankratz was placing Defendant's hands behind his back, Investigator Lennander approached Defendant from the front. Tr 18:13. According to

5

Investigator Lennander, he "observed a very heavy object that [he] believed to be a firearm in the front hoodie pocket that [Defendant] was wearing." Tr. 18:13-25. He testified that there was a very heavy object in the front pocket of Defendant's sweatshirt that was causing the pocket to sag and hang down. Tr. 18:25-19:9, 22:10-23; *see also* Ex. 2, Lennander's Body Worn Camera, at 00:37; Ex. 3.

Investigator Lennander grabbed the front pocket of Defendant's sweatshirt. Tr. 42:24-43:13; *see also* Ex. 2, Lennander's Body Worn Camera, at 00:40. He did not reach into the pocket, but instead grabbed the front of the sweatshirt and gripped the object from the outside of the sweatshirt. Tr. 19:15-21. Investigator Lennander testified that he "immediately recognized it when [he] grabbed it as a firearm." Tr. 19:12-13, 19:22-20:2, 49:16-19. He testified that in his experience as a law enforcement officer, he has observed an object in a person's pocket that appeared to be a handgun and it did in fact turn out to be a handgun. Tr. 20:3-20. Investigator Lennander notified his team that he located a firearm by yelling, "We got a gun. Gun, gun, gun." *See* Ex. 2, Lennander's Body Worn Camera, at 00:40-00:42; Ex. 2, Pankratz Body Worn Camera at 01:10-01:12; *see also* Tr. 19:13-14, 24:1-8, 43:14-21. Investigator Lennander kept his hand on the firearm to keep it secure while Investigator Pankratz finished handcuffing Defendant. Tr. 24:13-22, 49:20-25, 50:1-9. Defendant was handcuffed without incident. Tr. 24:20-22. Investigator Lennander then removed the firearm from Defendant's sweatshirt pocket, secured it in a plastic evidence bag, and put it in his vehicle. Tr. 24:23-25:3; *accord* Ex. 2, Lennander's Body Worn Camera, at 01:28-02:09. The investigators then brought Husten and Defendant to their squad vehicles. Tr. 25:10-14.

While Investigator Lennander's original plan was to detain Defendant and contact his supervised release agent regarding the apparent violation of his supervised release, he testified that his plan changed to arrest Defendant when the firearm was located on Defendant's person. Tr. 25:15-26:3. He testified that he had probable cause to arrest Defendant for a weapons offense at that point because he knew Defendant to be a felon and ineligible to possess a firearm. Tr. 26:4-8, 50:12-51:1.

Investigator Lennander testified that he called Defendant's supervising agent shortly after leaving the scene to discuss his conditions. Tr. 31:22-32:2, 43:22-44:14. According to Defendant's Conditions of Release, he cannot have contact or engage in any activity of any nature with any gang members without prior documented approval. Tr. 16:22-17:1; *accord* Ex. 1. Investigator Lennander testified that he knew how to look up Defendant's supervised release agent's contact information and could have contacted the agent at any point that day if he wanted to. Tr. 44:15-22.

### III. CONCLUSIONS OF LAW

Based upon the foregoing findings, the undersigned makes the following conclusions of law.

Defendant argues that the investigators violated his Fourth Amendment rights because they arrested him without a constitutionally sufficient basis to do so. Def.'s Mem. in Supp. at 5, ECF No. 40. Defendant contends that all resulting evidence, including the firearm and his post-arrest statements, must be suppressed. *Id*. In response, the Government argues that Defendant's motion to suppress should be denied because (1) officers had a basis to detain Defendant pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968) and

7

its progeny, as soon as officers saw Defendant with Husten; (2) the firearm was in plain view when officers approached Defendant and Husten; and (3) the investigators' seizure of the handgun at the scene of a felony arrest in a populated neighborhood was justified because of exigent circumstances or in a protective sweep for officer safety. Gov't's Mem. in Opp. at 5, ECF No. 41. Because the Court finds that the recovery of the firearm from Defendant's person was constitutional, the Court recommends that Defendant's motion to suppress be denied.

The Court first turns to the Government's argument that investigators had a basis to seize Defendant when they saw him with Husten. The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It is well settled that a warrantless search or seizure is "per se unreasonable under the Fourth Amendment— subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnotes omitted).

The Court finds that the seizure and search of Defendant's person was constitutional because under the terms of his supervised release, he agreed to "submit to any unannounced . . . searches by [DOC supervised release] agent/designee of [his] person. . . ." *See* Ex. 1 at 2. "[T]here is a clear exception to Fourth Amendment warrant requirements for the search of . . . persons of probationers, parolees and releasees . . . ." *United States v. Cain*, No. 08-cr-26 (PJS/JSM), 2008 WL 2498176, at *12 n.5 (D. Minn. May 21, 2008), *report and recommendation adopted in relevant part*, 2008 WL 2498139 (D. Minn. June 18,

8

2008). "[P]robationers[2] do not enjoy the absolute liberty to which every citizen is entitled." *United States v. Knights*, 534 U.S. 112, 119 (2001). Consequently, "[j]ust as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens." *Id*. When a court imposes a search condition upon a probationer, it "significantly dimishe[s] [the probationer's] reasonable expectation of privacy." *Id*. at 120; *United States v. Kuhnel*, 25 F.4th 559, 564 (8th Cir. 2022) ("An individual subject to a court-ordered search condition retains a 'significantly diminished . . . reasonable expectation of privacy.'") (quoting *Knights*, 534 U.S. at 118-19). "[W]hen a probationer is subject to a probationary search condition, the Fourth Amendment permits an officer to search pursuant to that [probationary] condition without a warrant based only upon that officer's reasonable suspicion that the probationer is violating his probation's terms." *United States v. Becker*, 534 F.3d 952, 956 (8th Cir. 2008) (quotation and citation omitted) (finding search of residence constitutional where officers had reasonable suspicion that the defendant had violated the terms of his probation); *see also United States v. Makeeff*, 820 F.3d 995, 1001 (8th Cir. 2016) (finding reasonable suspicion existed for probation officers to seize USB drive where a condition of the defendant's supervised release was that he submit to a search of his residence based upon evidence of a violation of a condition of release); *United States v. Brown*, 346 F.3d 808, 811 (8th Cir. 2003)

---

[2] The terms "probation," "probationary," and "probationers" are used synonymously with corresponding terms relating to "supervised release." *See United States v. Makeeff*, 820 F.3d 995, 1001 (8th Cir. 2016) ("Supervised release, parole, and probation lie on a continuum. The most severe is supervised release, which is . . . followed, in descending order, by parole, then probation[.] Thus, . . . , the current [supervised release] case involves the most circumscribed expectation of privacy.") (citation and quotations omitted).

9

(upholding search based on reasonable suspicion that the defendant was violating the terms of his probation); *see also United States v. Graber*, No. 8:18CR304, 2019 WL 2448561, at *2 (D. Neb. May 22, 2019) ("Although these prior cases primarily address the validity of warrantless searches pursuant to a condition of probation, the same reasoning applies to the seizure of Defendant's person pursuant to a similar condition of supervision.").[3]

At the time of the alleged offense in April 2022, Defendant was on supervised release with the DOC. Ex. 1 at 1 (stating that Defendant's supervised release begins on February 9, 2022 and ends on January 9, 2023). As a condition of his release, Defendant agreed to "submit to any unannounced . . . searches by the agent/designee of [his] person . . . ." Ex. 1 at 2. The Conditions of Release document "clearly expressed the search condition," and Defendant "was unambiguously informed" of this condition when he signed the document. *See Knights*, 534 U.S. at 119; *see also* Ex. 1 at 1-2. Therefore, Defendant's reasonable expectation of privacy was significantly diminished, and the warrantless search of his person was reasonable if supported by reasonable suspicion that he violated the terms of his supervised release. *See United States v. Hamilton*, 591 F.3d 1017, 1022 (8th Cir. 2010) (citing *Knights*, 534 U.S. at 118-19) (holding that a warrantless search of a probationer, who had agreed to such searches as a condition of probation, was reasonable under general Fourth Amendment analysis if supported by reasonable suspicion); *see also Becker*, 534 F.3d at 956 ("In the context of a probationary search

---

[3] State courts in Minnesota apply the same standard. *See, e.g., State v. Russell*, 2009 WL 233729, at *4 (Minn. Ct. App. 2009) (citing *State v. Anderson*, 733 N.W.2d 128, 138 (Minn. 2007) (holding "that a warrantless search of a probationer's home is valid where there is reasonable suspicion to believe that the defendant violated the conditions of his probation and that the probation conditions were validly imposed")).

condition, reasonable suspicion that the probationer has violated the terms of his probation is sufficient to justify a search.").

"Reasonable suspicion exists when, considering the totality of the circumstances known to the officer at the time, the officer has a particularized and objective basis for suspecting wrongdoing." *United States v. Hamilton*, 591 F.3d 1017, 1022 (8th Cir. 2010) (citing *United States v. Henry*, 429 F.3d 603, 609-10 (6th Cir. 2005) (using the "reasonable suspicion" test for a *Terry* stop in assessing whether parole officers had reasonable suspicion; *United States v. Baker*, 221 F.3d 438, 444 (3d Cir. 2000) (same)). The reasonable suspicion standard applies not only to wrongdoing of criminal activity, but also to violations of the terms of probation or supervised release. *See Becker*, 534 F.3d at 956 ("[R]easonable suspicion that the probationer has violated the terms of his probation is sufficient to justify a search."). The degree of individualized suspicion necessary for "a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable." *Knights*, 534 U.S. at 120 (citation omitted). Standard Fourth Amendment analysis applies to a probationary search, and thus, a "parole officers' subjective purpose for the search is irrelevant to [the Court's] analysis, and [the Court] look[s] only at whether the parole officers' conclusion that reasonable suspicion existed was objectively reasonable." *Hamilton*, 591 F.3d at 1022 (quotation and citation omitted).

Here, Investigator Lennander testified credibly that at the time of the search, he knew that Defendant was on supervised release for a felony weapons-related offense, was a known gang member, and was the brother of Dai'quan Husten, also a known gang

11

member on supervised release for a weapons-related offense. Tr. 12:8-25, 30:5-7, 51:7-10, 51:21-52:5. While Investigator Lennander did not call Defendant's supervising agent to discuss Defendant's conditions of release, he has over six years of experience with the DOC and knows from experience that there are standard terms of supervised release for individuals convicted of violent offenses or with gang activity in their past like Defendant and Husten. Tr. 46:19-25. Investigator Lennander testified credibly that he knows those conditions to include restrictions on associations with other gang members. Tr. 7:22-8:2, 9:13-14, 31:2-21, 32:11-12, 47:1-3, 52:6-13. He also testified credibly that he believed Defendant to be in violation of the no-contact-with-gang-members condition of his supervised release when he observed Defendant walking with Husten. Tr. 13:17-22, 16:16-21, 32:25-33:20, 36:16-18, 45:25-46:8. Thus, Investigator Lennander planned to conduct a probationary search of Defendant and contact his supervised release agent to see how the agent wanted to proceed. Tr. 14:21-15:3, 16:16-21, 34:8-11, 47:9-23. Taken together, the Court finds that this information established reasonable suspicion that Defendant was in violation of the terms of his supervised release so as to permit the investigators to conduct a warrantless seizure and search of Defendant's person. *See Graber*, 2019 WL 2448561, at *2-3 (finding that officers had reasonable suspicion to detain and search the parolee for a suspected violation of his terms of supervision).

Defendant argues that his "initial seizure cannot be supported by an alleged violation of his DOC supervised release because the investigators lacked any objective evidence to reasonably believe he had violated his release conditions before they seized him, whether by having contact with his brother, 'a known gang member,' or in any other

12

way." Def. Mem. in Supp. at 10. Specifically, Defendant contends that Investigator Lennander could not have known Defendant's conditions of release included a no-contact-with-gang-members condition because he had not discussed Defendant's conditions of release with Defendant or his supervising agent or reviewed his Conditions of Release document. *Id*. at 12. Therefore, he argues that it was "not reasonable for the investigators to believe [Defendant] had violated his conditions of release simply by being with his brother." *Id*. at 12. As discussed above, however, Investigator Lennander has over six years of experience with the DOC and his primary duties include locating and arresting offenders for alleged violations of supervised release. Tr. 7:22-8:2, 8:14-9:14, 28:21-25; *see also United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006) ("In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the officers' experience and specialized training.") (citation omitted). Investigator Lennander conducts thorough investigations into individuals on supervised release, *i.e.*, spending several months and approximately 40 hours trying to locate Husten, and the Court has no reason to doubt his familiarity with the special conditions typically imposed on offenders convicted of violent offenses or with gang activity in their past like Defendant. Tr. 29:22-30:4, 46:19-25, 51:14-20. Investigator Lennander's credible testimony that he reasonably believed that Defendant was in violation of his supervised release conditions by being with a known gang member provided reasonable suspicion to seize and search Defendant. Accordingly, the Court recommends that Defendant's motion to suppress the evidence

seized as a result of the search be denied.[4]

## IV. RECOMMENDATION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, ECF No. 23, be **DENIED**.

Date: March   6  , 2023                                            *s/Tony N. Leung*
                                                                    Tony N. Leung
                                                                    United States Magistrate Judge
                                                                    District of Minnesota

                                                                    *United States v. Myles*
                                                                    Case No. 22-cr-205 (MJD/TNL)

## NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:**  This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.

---

[4] Because the Court finds that reasonable suspicion existed for the investigators to seize and search Defendant based on a supervised release violation and recommends that Defendant's motion to suppress be denied on that basis, the Court declines to address the Government's remaining justifications for the search and seizure, including a *Terry* stop and frisk for discovery of weapons; plain view; exigent circumstances; and protective sweep.  *See generally* Gov't's Mem. in Opp.